## STATE OF CONNECTICUT *v.* DEREK SMITH
### (AC 15728)

Lavery, Sullivan and Daly, Js.

Argued February 19—officially released June 30, 1998

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, with whom, on the brief, were *James E. Thomas*, state's attorney, *Mary H. Lesser*, assistant state's attorney, and *Warren Maxwell*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant,[1] Derek Smith, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (4)[2] and 53a-8,[3] and conspiracy to commit assault in the first degree in violation of

---

[1] The defendant, Derek Smith, was tried with codefendants Antonio Grayer and Jose Lopez. This appeal concerns only Smith.

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person . . . ."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes §§ 53a-48 (a)[4] and 53a-59 (a) (1).[5] On appeal, the defendant claims that the trial court improperly (1) excluded evidence that would have shown that the defendant was not present at a drug sale after the victim testified that the defendant was present and (2) permitted the state to vouch for the credibility of the victim. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 9, 1994, at approximately 3 p.m., the victim, a confidential informant for the Bristol police department, was on assignment attempting to purchase narcotics in the Union Street area of Bristol. The victim was outfitted with a body microphone, searched for any narcotics, given marked "buy" money and then delivered by police officers in an unmarked cruiser to a drop-off site. Officers of the Bristol police department were monitoring the victim's actions in this operation. Approaching a housing project at 159 Union Street, the victim saw Antonio Grayer. The victim asked Grayer if he had anything, and Grayer whispered that there was nothing around. The victim was then approached by Jose Lopez, whom he recognized from having seen Lopez make a drug sale in the past. The victim asked Lopez if he could get something. Lopez did not respond. The victim then saw the defendant. When the victim asked the defendant if he knew where he could get cocaine, the defendant replied, "Hell, no." He then

---

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

asked the defendant if the defendant remembered him. The defendant looked at Grayer and asked, "Who is this guy?"

As the victim turned to leave, a fourth man, named Santiago, waved him over. Before the victim reached Santiago, the defendant called Santiago over to him. The defendant, Santiago, Grayer and Lopez gathered together talking and looking at the victim. Santiago then motioned for the victim to come with him. They walked to the building at 159F Union Street and entered a hallway. Santiago closed the door. The victim asked if he could get some drugs and if Santiago had change for a $20 bill. Santiago said they were waiting for someone who would bring the "stuff." Santiago looked out of the door and said the person was on his way.

Next, the door burst open and the defendant entered with a towel over his head, along with Lopez and Grayer. As they entered the hallway, all three men began swinging their fists. Santiago, who was behind the victim, began hitting him in the back, and the other three joined in beating and kicking the victim. Santiago handed the defendant a bicycle tire rim with an attached axle. The defendant placed the tire on the victim's back and legs and then kicked it. This beating lasted for about thirty seconds during which the defendant yelled, "Let's kill [him]." At some point during the beating, the victim removed the towel from the man kicking him and saw that he was the defendant. The beating ended when a boy opened the door and said something that caused the four attackers to flee the area. Detectives from the Bristol police department then entered the hall and rescued the victim.

Upon being taken outside, the victim immediately identified Santiago and Grayer, whom the police had detained. The victim was then taken to a hospital for treatment of his injuries. Among the victim's injuries

were a broken finger, two broken ribs, a cut on his head that left a scar and the aggravation of a back problem.

I

The defendant claims that the trial court improperly prevented him from presenting evidence that would have shown that he was not present when the victim bought drugs from his friend after the victim had testified that the defendant was present. Specifically, the defendant claims that the trial court's ruling violated his state and federal constitutional rights to a meaningful opportunity to present defense evidence and to a fair trial, and constituted evidentiary error. We disagree.

The following additional facts are relevant to a resolution of this issue. Over the defendant's objection, the victim testified that he knew the defendant prior to the day of the assault through a buy he had made from a friend of the defendant. He further testified that the defendant knew that he was an informant because of this purchase from the defendant's friend, in the defendant's presence.[6] On cross-examination, the defense counsel refreshed the victim's recollection with a police report, and the victim testified that the date of the buy from the defendant's friend was June 24, 1993. The victim also testified on cross-examination that the buy took place in the parking lot of the Burger King restaurant in Bristol at about 6:05 p.m.

---

[6] The defendant's friend was arrested on drug charges later in the evening following the controlled buy by the victim. While that fact was never expressly elicited in front of the jury, the prosecutor argued to the jury that the victim "was instrumental in the arrest of [the defendant's] best friend . . . ." Moreover, on cross-examination, the defendant's attorney sought to refresh the victim's recollection as to the time of day of the sale by the defendant's friend by presenting him with a copy of the police report generated after that controlled buy. The jury could therefore have reasonably inferred that the defendant's friend was arrested following the buy.

Outside the presence of the jury, the defendant attempted to present testimony that on June 24, 1993, the defendant was at the Bristol Alternatives to Incarceration Center (center), attending a Narcotics Anonymous meeting from about 5:45 p.m. until about 8 p.m. In addition, the defendant had marked for identification the sign-in logs used at the center. The state objected. The defendant argued that this testimony and evidence was relevant to refute the state's motive theory and that it undermined the reliability of the victim's identification of the defendant. The trial court sustained the state's objection on the ground that the proffered evidence was collateral. In the state's closing argument, the prosecutor repeated to the jury the victim's testimony that the defendant knew that he was an informer and argued that although motive is not an element of the crime, this showed that there was a motive in this case.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct.

972, 133 L. Ed. 2d 892 (1996)." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

"On cross-examination, every permissible type of impeachment that may be employed during cross-examination has as one of its purposes the testing of the credibility of the witness. The use of extrinsic evidence to contradict is more restricted due to considerations of confusion of the issues, misleading the jury, undue consumption of time, and unfair prejudice raised by the introduction of so-called collateral matters. If a matter is considered collateral . . . extrinsic evidence, i.e., evidence offered other than through the witness himself, in contradiction is not permitted." 1 C. McCormick, Evidence (4th Ed. 1992) § 49, pp. 182–83. "A witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case. *State* v. *Burns*, 173 Conn. 317, 327, 377 A.2d 1082 (1977); *State* v. *Carbone*, 172 Conn. 242, 262, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *Wilson*, 158 Conn. 321, 324, 260 A.2d 571 (1969)." *State* v. *Negron*, 221 Conn. 315, 327–28, 603 A.2d 1138 (1992).

"The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination, generally rests within the sound discretion of the trial court. *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987); *State* v. *Ontra*, 178 Conn. 480, 488, 423 A.2d 134 (1979); *Todd* v. *Bradley*, 99 Conn. 307, 323–24, 122 A. 68 (1923)." *State* v. *Colton*, supra, 227 Conn. 248. A matter is not collateral if it is "relevant for a purpose other than mere contradiction of the in-court testimony of the witness." 1 C. McCormick, supra, p. 183. "A witness may be impeached by the introduction of contradictory evidence of other witnesses as long as the evidence is in fact contradictory; *State* v. *Artieri*, 206

Conn. 81, 83, 536 A.2d 567 (1988); and that evidence does not relate to a collateral matter. *State* v. *McCarthy*, 197 Conn. 166, 176, 496 A.2d 190 (1985); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. [1988]) § 7.24.1 [pp. 206–207]. A contradiction is not collateral if it is relevant to a material issue in the case apart from its tendency to contradict a witness. . . . Whether extrinsic evidence contradicts testimony of a witness so as to require its introduction into evidence for impeachment purposes is within the trial court's discretion, subject to review only for abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Viet X. Nguyen*, 17 Conn. App. 234, 239–40, 552 A.2d 823 (1989).

"The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. The other evidence may be such as to justify a conviction without any motive being shown. It may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Harris*, 182 Conn. 220, 224, 438 A.2d 38 (1980).

On appeal, the defendant argues that the proposed testimony and evidence was not collateral because it was necessary to rebut the state's motive and prior identification evidence. The defendant argues that motive was an important issue in this case. Specifically, the defendant argues that because the state attempted to show that he knew that the victim was an informant and that this gave him a motive to assault the victim, he should have been allowed to present his evidence. Further, he argues that because the victim testified that the defendant had observed the victim and the defendant's friend engage in a drug transaction at a certain time on a certain date, had he been allowed to present evidence that he was not present at the time and date in question, this would have refuted the state's evidence

of motive and questioned the victim's identification testimony.

The state argues that motive was not an important issue in this case. In addition, the state argues that the introduction of the extrinsic evidence would have refuted only the defendant's presence on the date and time of the transaction at Burger King and not the defendant's knowledge that the victim was an informant. The state also argues that the introduction of the extrinsic evidence would have led to a mini-trial on the events surrounding the drug transaction between the victim and the defendant's friend, as well as to whether the victim had the right date or the right occasion.

As to the defendant's claim that evidence that he was not present during the drug sale by his friend would have called into question the victim's identification of the defendant as his attacker, there was ample evidence aside from the testimony sought to be rebutted to support the victim's ability to identify the defendant. The evidence presented to the jury showed that the victim and the defendant had observed each other on a number of occasions prior to the assault of the victim on July 9, 1994. It is undisputed that the defendant and the victim encountered each other minutes before the assault occurred. Nor is it disputed that the attack occurred. Further, the victim testified that during the attack he removed the towel from the head of one of his attackers and saw that he was the defendant. Also, upon being rescued by the police, the victim immediately identified the defendant as his attacker.

On the basis of our review of the record, transcripts and briefs, we cannot say that the trial court abused its discretion in determining that the extrinsic evidence presented by the defendant was collateral and not relevant to a material issue in the case. We conclude that the trial court's decision to exclude the extrinsic evidence

offered by the defendant was well within its discretion, and did not result in an injustice to the defendant and did not deprive the defendant of a fair trial or violate his right to present defense evidence.

## II

The defendant next claims that the trial court improperly permitted the prosecutor to elicit from a witness testimony that the victim was a reliable informant and to vouch for the victim's credibility during closing arguments. The defendant also claims that the trial court improperly denied his motion for a new trial. We disagree.

## A

Following the victim's testimony, the state called Detective David Carello of the Bristol police department as a witness. He testified that he had been assigned to the narcotics enforcement team for eight years and had known the victim in a professional capacity as a police informant. The state then asked: "And how would you classify him as an informant?" Carello replied, "Reliable." The defendant objected on the grounds that Carello's classification was an opinion, a conclusion and irrelevant. The trial court overruled the objection. The state then again asked: "How would you classify him, sir?" Carello responded, "[The victim] was reliable." Carello then testified that the victim had been working for the Bristol police department as an informant for two years. He then testified about the procedures used in training an informant.

The defendant argues that because Carello testified as to the victim's being reliable, the jury was permitted to infer that the victim had made reliable identifications of other people involved in criminal activity. Further, the defendant argues that the victim's reliable identifications made in other, unrelated cases were irrelevant

and improperly enhanced the credibility of the victim's identification of the defendant in this case. We disagree.

Our review of the record, transcripts and briefs reveals that Carello simply stated that the victim was a reliable informant. Carello did not testify that the victim had previously identified criminal defendants in other unrelated matters or that the victim had provided trustworthy information resulting in other identifications in the past. Without more, we cannot conclude that Carello's testimony that the victim was a reliable informant rises to the level of impermissible vouching for the credibility of a government witness sufficient to warrant reversal. We conclude that the trial court did not abuse its discretion in admitting this testimony and that the defendant's right to a fair trial was not violated.

B

The defendant also argues that certain statements made by the prosecutor during his rebuttal argument to the jury improperly vouched for the victim's credibility. Specifically, the defendant argues that prosecutorial misconduct occurred when the prosecutor stated that the victim was "doing difficult, difficult, undercover police work. And when he comes into court, you can be darn sure he is sure. And not making up fantasies, as would be suggested by [the defendant's counsel]. . . . That man is a genuine citizen, not like [the defendant's counsel] wants to call him, 'baggage.' That guy's a saint."

"Prosecutorial misconduct may . . . occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact. . . .

"The defendant claims that the prosecutorial misconduct in this case was so egregious that it deprived him

of his constitutional right to a fair trial under the due process clause of both the state and federal constitutions. In analyzing the defendant's claim, we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *Darden* v. *Wainwright*, [477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)]; *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense counsel or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538–40, 529 A.2d 653 (1987).

In this case, during the closing arguments made by the defense counsel for each of the three defendants, the victim was characterized as a puppet of the Bristol police department and, further, that the victim "wasn't just a puppet. He was like a little puppy. He wanted to be petted, caressed by the police. He wanted to do

good for them." The victim was also characterized as distorting the facts to strengthen the state's case.

The prosecutor responded to these statements by the defense counsel in his rebuttal argument. He argued that the jury should remember the victim's demeanor while testifying and that the victim had no motive to lie. The prosecutor then made the comments now in question. The defendant objected, and the jury was excused. The trial court did not agree with the defendant that the prosecutor's comments improperly vouched for the victim's credibility and determined that they were merely argument.

In its instructions, the trial court instructed the jurors that they were the ones who were to determine the facts on the basis of the evidence in this case. The trial court stated: "Keep in mind that arguments and statements by the attorneys in final argument or during the course of the case are not evidence. You should not consider as evidence their recollections of the evidence, nor their personal beliefs as to any facts or as to the credibility of any witness. No attorney should argue to you that someone is or is not a saint. And you will not, of course, consider that." On the issue of credibility, the court instructed: "[L]et me talk to you about that area of the law—believability, credibility. You observed the witnesses. Their credibility, the believability of the witnesses and the weight to be given to the witnesses' testimony are matters entirely within your hands. It is for you alone to determine the witnesses' credibility. . . . The credibility of the witness and the truth of the fact is for you to determine." With regard to the testimony of police officers, the trial court instructed: "And the testimony of a police officer is entitled to no special or exclusive sanctity, merely because it comes from a police officer. . . . A police officer who takes the witness stand subjects his or her testimony to the same examination and the same tests that any other

witness does." Finally, in instructing on credibility, the trial court stated: "In short, size up the witnesses. Make your own judgment as to their credibility and decide what portion—all, some, or none—of any particular witness' testimony that you'll believe, based on these principles. . . . The credibility you will give to the testimony offered is, as I have told you, something which you alone must determine."

Under the circumstances of this case, the prosecutor's comments were not so egregious as to deprive the defendant of his constitutional right to a fair trial. The prosecutor's comments were invited by the attacks on the victim made by the defense counsel during closing arguments. The comments themselves were limited to the rebuttal argument and did not specifically state that the prosecutor believed that the victim was telling the truth. Furthermore, the trial court's instructions to the jurors were more than sufficient to eliminate any confusion on the part of the jurors concerning their role in finding the facts and in determining the credibility of individual witnesses in this case. We cannot say that the prosecutor's comments infected the trial with unfairness.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] We also conclude that the trial court properly denied the defendant's motion for a new trial.